

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-19-00772-CR

Carlos **ROMO**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2018-CRF-001456-D2
Honorable Monica Z. Notzon, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice
Dissenting Opinion by: Patricia O. Alvarez, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Patricia O. Alvarez , Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: May 26, 2021

AFFIRMED IN PART; REVERSED AND RENDERED IN PART

Following a jury trial, Carlos Romo, Jr., was convicted in Count I of continuous sexual abuse of a child younger than fourteen years of age, in Count II of indecency with a child, and in Count III of possession of child pornography. Romo brings three issues on appeal. First, he argues that the jury was not the correct factfinder to determine whether the material alleged to be child pornography was lewd. Second, with respect to all three counts, he argues the evidence is legally insufficient to support his conviction. Third, he argues that the trial court erred in fining him $10,000 as part of his sentence. We affirm the trial court's judgment with respect to Counts I and

II. However, with respect to Count III, we reverse the trial court's judgment and render a judgment of acquittal.

## BACKGROUND

At trial, there was evidence presented of the following facts: "Sky,"[1] Romo's daughter, was twelve years old when she made an outcry that Romo had been sexually abusing her since she was eight years old. Sky's mother (and Romo's wife) testified at trial that she had not wanted to share a bed with her husband, because Romo always pressured her into having sex and then would criticize her afterwards for "not doing a good job."

Romo and Sky regularly watched television shows and movies together alone in her bedroom with the volume turned up. According to Sky's mother, Romo was never fully clothed when he was in Sky's room, and the door to Sky's bedroom was usually jammed or locked. Sky's mother testified that when she knocked on Sky's bedroom door, Romo would take five to six seconds to open the door.

Romo and Sky spent time at home alone about three times per week—sometimes in the bedroom, the living room, or in the bathroom. Sky's mother was aware that Romo and Sky regularly showered together but did not report witnessing any sexual behavior between them. This practice continued even after Sky's mother told them to stop because it was inappropriate. Sky's mother also regularly left the house during the week because she did not want to fight with Romo in front of the children and so she "tried not to be there." She also testified that the house was noisy because of (1) Sky and her siblings and (2) the two televisions that were on regularly—one in the living room and the other in Sky's bedroom.

---

[1] "Sky" is a pseudonym for the victim in this case.

Sky testified that when she and Romo were alone together, Romo would touch and kiss her breasts, and rub her vagina both over and under her clothing with his hand and with his penis. Romo also placed his hand inside Sky's vagina, which she testified sometimes hurt. According to Sky, Romo told her that what he was doing to her was their secret. Sky testified that Romo also placed his penis inside her vagina, causing her to bleed. Romo made her rub his penis with her hand and suck on his penis with her mouth. She also testified that he placed his penis inside her anus, which hurt her. According to Sky, Romo kept condoms and lubricating jelly in a drawer in Sky's bedroom, which he used sometimes with her. Sky testified that at one point, she witnessed Romo watching pornography. Sky's mother testified that when she later cleaned Sky's bedroom, she found the condoms and lubricant jelly in Sky's drawer.

Sky testified that in 2017, Romo tried to give her $300 to "play with him." When she would not "play with him," he took away her phone. He also told her he was angry with her for having a male friend at school with whom she texted and talked to over Snapchat. Romo followed her around at school because she was "being bad," and he did not want her to spend any time with male friends there.

Sky decided that she did not want her father to continue sexually abusing her, so she told her cousin about the sexual abuse she had been experiencing. She then outcried to a forensic interviewer at the Children's Advocacy Center. Around the time of Sky's outcry, Sky's mother saw Romo and Sky talking together in low tones and said they looked upset and worried. Romo denied Sky's accusations of sexual abuse, claiming that Sky lied because she was upset that Romo would not let her have a boyfriend.

The Department of Family and Protective Services then became involved, causing Romo to move out of the family's home. Sky admitted that she and her siblings missed him. Sky's mother took the family to stay with Romo in a hotel for a week in violation of the Department's restrictions

so that the children could spend time with Romo. Sky's mother testified she had a feeling that Romo was going to jail, and she wanted the children to see him at least one last time. During that visit, Romo took Sky to the mall and bought her a bra and perfume. A week after the hotel visit, Sky recanted. Sky testified he made her feel guilty about her outcry and told her not to ruin the family. Sky testified she then felt sad, and when asked, she admitted she had "taken back her story" because she felt guilty. Nevertheless, at trial, Sky was firm in her testimony about her father's abuse. Sky's mother also testified that Romo conveyed suicidal feelings at times, but that he expressed these feelings when he wanted the family to feel guilty about something.

During the investigation that followed, police discovered a DVD titled "Nudist HDV" in Romo's office at the Food Bank where he worked. The DVD showed several young girls participating in a nude beauty competition. Based on this evidence and testimony regarding the State's investigation, Romo was convicted of all three counts against him. He now appeals.

### COUNT III – "LEWD" MATERIAL

Romo argues that the existence of "lewd" material in a child pornography case is a legal matter for the trial court to discern and not for the jury as factfinder to decide. According to Romo, the trial court should have first determined whether the "Nudist HDV" DVD was lewd before it was shown to the jury. He argues that once the jury saw the video, it could not be impartial, thus resulting in his rights under the Sixth and Fourteenth Amendments being violated. However, Romo did not object at trial to the admission of the "Nudist HDV" DVD. To preserve error, "a party must object each time the inadmissible evidence is offered or obtain a running objection." *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003); *see also* TEX. R. APP. P. 33.1(a)(1) (providing that a party does not preserve an issue for appellate review if he fails to object in the trial court at the time the evidence is offered). Because Romo failed to object at the time the video was admitted, he has waived any error on appeal. *See Grado v. State*, 445 S.W.3d 736, 739 (Tex. Crim. App.

2014) (explaining that except for narrow exceptions, "all errors—even constitutional errors—may be forfeited on appeal if an appellant failed to object at trial"). We therefore overrule his first issue.

## LEGAL SUFFICIENCY

With respect to each count, Romo argues the evidence is legally insufficient to support his convictions. In a federal due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The court of criminal appeals has explained that this standard "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence." *Adames*, 353 S.W.3d at 860. Therefore, on appellate review, we determine whether based on "cumulative force of all the evidence" the necessary inferences made by the trier of fact are reasonable. *Id.* We conduct this constitutional review by measuring the evidentiary sufficiency with "explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.*

Because the jury is the sole judge of the credibility of a witness's testimony and the weight to assign to that testimony, the jury "can believe all, some, or none of a witness's testimony." *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). "If the record supports contradictory reasonable inferences, we presume that the jury resolved the conflicts in favor of the verdict." *Id*. at 856.

### A. Count I (Continuous Sexual Abuse of a Child Younger Than Fourteen Years of Age) and Count II (Indecency with a Child)

Pursuant to section 21.02(b) of the Texas Penal Code, a person commits continuous sexual abuse of a young child if (1) during a period that is thirty or more days in duration, the person

commits two or more acts of sexual abuse; and (2) at the time of the commission of each of the acts of sexual abuse, the actor is seventeen years of age or older and the victim is a child younger than fourteen years of age. TEX. PENAL CODE § 21.02(b). An "act of sexual abuse" is defined as "any act that is in violation of one or more of the following penal laws," including, but not limited to, indecency with a child under section 21.11(a)(1); sexual assault under section 22.011; and aggravated sexual assault under section 22.021. *Id*. § 21.02(c)(2), (3), (4).

Pursuant to section 21.11(a)(1), a person commits indecency with a child if, with a child younger than seventeen years of age, whether the child is of the same or opposite sex and regardless of whether the person knows the age of the child at the time of the offense, he engages in sexual contact with a child or causes the child to engage in sexual contact. *Id.* § 21.11(a)(1). "Sexual contact" means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person: (1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or (2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person. *Id*. § 21.11(c).

Romo argues the evidence is insufficient to support his convictions under Counts I and II because the doctor who physically examined Sky found her exam to be "normal" and her hymen intact. Romo also points out that Sky was exhibiting behavioral problems around the time of her outcry, such as pulling a boy's pants down at school and disrupting class by switching the lights on and off. He also emphasizes that the therapist who was treating Sky noted that Sky reported having heard voices, which Romo highlights as a symptom of untreated mental illness. He further argues that Sky's testimony about her recanting her story damaged her credibility as a witness. Finally, he argues that Sky had a personal interest in accusing him of a sexual crime against her because she was angry he would not let her have a boyfriend.

In reviewing the entire record, we note that the doctor who examined Sky also testified that, with time passing between Sky's last sexual interaction and her exam, it is possible that her exam would be normal, and that it was also possible her hymen would remain intact even with sexual activity. Further, Sky's therapist pointed out that Sky's experience of hearing voices was not dispositive of mental illness. Given the evidence presented at trial, the jury could have reasonably believed Sky's testimony that she was sexually abused and concluded that her behavioral issues were the result of sexual abuse. In reviewing the testimony of all the witnesses at trial, a jury could have reasonably believed that Sky's behavioral difficulties stemmed from her being sexually abused by her father, and that Sky's father did not want her to have a boyfriend or male friends at school because he wanted to control Sky's behavior. Because the result on these counts turns on the jury's determination of witness credibility, we hold the evidence is legally sufficient to support his convictions on Count I and Count II. *See Metcalf*, 597 S.W.3d at 855 (explaining that the jury is the sole judge of the credibility of the witnesses and of the strength of the evidence).

### B. Count III (Possession of Child Pornography)

A person commits the offense of possession of child pornography if he knowingly or intentionally possesses visual material that visually depicts a child younger than eighteen years of age at the time the image of the child was made who is engaging in sexual conduct, and the person knows that the material depicts such a child. TEX. PENAL CODE § 43.26(a). In this case, the sexual conduct was specified as "lewd exhibition of the genitals," which is included in the definition of sexual conduct under section 43.25(a)(2). *See id*. §§ 43.25(a)(2), 43.26(b)(2). "Lewd exhibition of the genitals" has not been statutorily defined by the Texas Legislature. *State v. Bolles*, 541 S.W.3d 128, 138 (Tex. Crim. App. 2017). While we conduct our "sufficiency review by examining all the evidence in the record in the light most favorable to the verdict to determine whether any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we "conduct a de novo review of mixed questions of law and fact that do not depend on the credibility and demeanor of witnesses." *Id*. at 133-34 (citations omitted). The court of criminal appeals has explained that "the meaning of the undefined statutory phrase 'lewd exhibition of the genitals' is a matter of law" that we review de novo. *Id*. at 134. "Thus, in assessing whether any rational trier of fact could have found the essential elements of the crime of possession of child pornography beyond a reasonable doubt, while we still assess the evidence in the light most favorable to the verdict, we conduct a de novo review to determine whether" the "Nudist HDV" DVD at issue in this appeal constitutes "child pornography." *Id*.

In determining whether depictions of nude children are "lewd" for purposes of child pornography, the court of criminal appeals has relied on factors enunciated in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987), *and aff'd*, 813 F.2d 1231 (9th Cir. 1987). *See Bolles*, 541 S.W.3d at 140 (relying on factors enunciated in *Dost*). The *Dost* court listed six factors that may be used to evaluate whether a visual depiction constitutes child pornography:

(1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

(2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

(3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

(4) whether the child is fully or partially clothed, or nude;

(5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

(6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Bolles*, 541 S.W.3d at 140 (quoting *Dost*, 636 F. Supp. at 832). The court of criminal appeals acknowledged that courts are "not bound by *Dost* when assessing whether an image depicts a 'lewd exhibition.'" *Bolles*, 541 S.W.3d at 142. The *Dost* factors do not define the term "lewd exhibition" and "serve only as a guide." *Bolles*, 541 S.W.3d at 142-43. Thus, "no single factor is dispositive." *Id*. at 143. "Whether an image falls within the statutorily defined category of child pornography under Texas state law is a question that must be answered on a case by case basis." *Id*.

> Thus, borrowing from what Justice Stewart famously observed about pornography in his concurring opinion in *Jacobellis v. Ohio*, we shall not attempt further to define the kinds of material we understand to be child pornography; and perhaps we could never succeed in intelligibly doing so. But we know it when we see it.

*Bolles*, 541 S.W.3d at 143 (citing *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring)).

According to the court of criminal appeals, the *Dost* factors "aid us in assessing how and why we know it when we see it." *Id*. The *Dost* factors "are useful for assessing the sufficiency of evidence, and pose questions that are (at least) germane to the issue." *Bolles*, 541 S.W.3d at 141 (citation omitted). "A visual depiction need not involve all of these factors to be a lascivious exhibition of the genitals or pubic area." *Id*. (quoting *Dost*, 636 F. Supp. at 832). "The *Dost* factors are simply guideposts or a starting point." *Bolles*, 541 S.W.3d at 141. "Some of the six *Dost* factors may not be relevant, and other factors not enumerated in *Dost* may be relevant." *Bolles*, 541 S.W.3d at 141. "The ultimate determination of whether the material depicts a 'lewd' or 'lascivious' exhibition must be made based 'on the overall content of the visual depiction.'" *Id*. (quoting *Dost*, 636 F. Supp. at 832). We will therefore consider the *Dost* factors in assessing whether the "Nudist HDV" DVD constitutes an image of a child under eighteen years of age engaged in the "lewd exhibition of the genitals." *See Bolles*, 541 S.W.3d at 143.

Application of the *Dost* Factors to the Evidence Presented at Trial

At the time of the investigation, Romo was working at the Laredo Food Bank. Police recovered from Romo's effects at the Food Bank a DVD video titled "Nudist HDV." The video contained footage of men, women, and girls at a purported nudist camp. In the jury charge, the jury was tasked with deciding whether the video constituted child pornography—specifically, whether it met the definition of "lewd exhibition of the genitals" as alleged in the indictment.

The video opens with a disclaimer that it portrays nudist life in its simplicity in European camps, clubs, and areas, and that it is not sexually oriented or adult in nature. The video claims to violate no federal laws, to depict entire families, and to be documentary and educational material. The next screen states that the video depicts the lifestyle of "naturism," which is followed by an offer of many downloadable hours with a single membership. The video focuses mainly on naked pre-pubescent girls who are outside in a grassy, picnic-type area on a windy day, talking both with other girls, and some adults. Some of the people in the video are sitting on blankets or towels that are placed on the ground, while others are walking about. There are no pre-pubescent boys shown in the video, and the video is entirely in French and contains no English subtitles. The video ends with the girls standing in a line waiting, one of whom appears pubescent, holding number placards from one to five. The video ends before the "pageant" concludes.

The first *Dost* factor asks whether the focal point of the visual depiction is on the child's genitalia or pubic area. In reviewing the video, we note that it does not focus on the children's genital or pubic area. *See Bolles*, 541 S.W.3d at 140 (quoting *Dost*, 636 F. Supp. at 832). The video shows fully or partially nude young girls, and adults, as they sit on picnic blankets or towels and walk around an outdoor area. As the girls wait for the pageant to start, the cameraman appears to be interviewing them. As the cameraman is talking to the girls, the camera is focused only on their faces.

The second *Dost* factor asks whether the setting of the visual depiction is sexually suggestive—that is, in a place or pose generally associated with sexual activity. *See Bolles*, 541 S.W.3d at 140 (quoting *Dost*, 636 F. Supp. at 832). As noted, the video takes place outdoors during the day in a grassy, picnic area. Some of the adults and girls sit or lounge on towels placed on the ground, while others sit at a table, or walk around and talk to one another casually. There is no sexual activity depicted on the video, and when asked whether sexual acts were shown on the video, Investigator Rosales agreed that no such acts were depicted. Instead, he testified that the video was of a "nudist camp."

The third *Dost* factor asks whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child. *See Bolles*, 541 S.W.3d at 140 (quoting *Dost*, 636 F. Supp. at 832). Some of the girls on the video are walking, some are standing, some are lying on the ground, and some are sitting but none of these positions are "unnatural." The five girls who appear to be participating in a pageant are not posed unnaturally either. They appear to be waiting for the pageant to begin and are standing in a line from tallest to shortest while holding numbered placards.

The fourth *Dost* factor asks whether the child is fully or partially clothed, or nude. *See Bolles*, 541 S.W.3d at 140 (quoting *Dost*, 636 F. Supp. at 832). The majority of the girls in the video are fully nude, save for their shoes, although at least one can be seen wearing bottoms. At times, the girls also use towels to cover themselves.

The fifth *Dost* factor asks whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity. *See Bolles*, 541 S.W.3d at 140 (quoting *Dost*, 636 F. Supp. at 832). During the video none of the girls engage in any sexual activity. The girls appear casual when talking to each other. When they appear to be interviewed by the cameraman on the video, they look either shy or uncomfortable.

The sixth *Dost* factor asks whether the visual depiction is intended or designed to elicit a sexual response in the viewer. *See Bolles*, 541 S.W.3d at 140 (quoting *Dost*, 636 F. Supp. at 832). At the beginning of the video the following information is provided in English:

> Nudist Video Documentaries, Portrays Nudist Life in Simplicity, Violates No Federal Laws, From European Nudist Camps, Clubs and Areas, Depicts Entire Families, Documentary and Educational Material; Is not Sexually Oriented or Adult in Nature; This Video Shows the Lifestyle of Naturism; Unauthorized Sale, Distribution, Screening, or Rental Will Result In Legal Action." It also offers that a complete nudist video catalogue is available with the option for many hours of downloadable footage online with a membership.

Because no transcription of the video was offered in evidence, we are unable to determine what is being said on the video. *See Garcia v. State*, No. 08-19-00176-CR, 2021 WL 235658, at *5 n.5 (Tex. App.—El Paso Jan. 25, 2021, no pet. h.) (explaining that the court does not consider as evidence "any portion of the dash cam video that is conducted in Spanish, because nothing appears in the record that would be an accurate translation of the Spanish conversations"); *see also Garza v. State*, 996 S.W.2d 276, 281 (Tex. App.—Dallas 1999, pet. ref'd) (explaining that "[w]hen a tape recording of a conversation in a foreign language is admitted into evidence, the situation is analogous to when a non-English speaking witness testifies, and the safeguards of code of criminal procedure article 38.30 [regarding interpreters] apply"). We are left to review the visual images depicted on the video and the intonation of the voices, none of which appear to be out of the ordinary. Without more, on this record, and using the *Dost* factors as a guide, we conclude the evidence is legally insufficient to support a finding that the video depicts a "lewd exhibition of the genitals" as defined in the jury's charge. Accordingly, with respect to Count III, we reverse judgment and render an acquittal.

**FINE IMPOSED**

Finally, Romo argues that the $10,000 fine imposed against him as part of his sentence was cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Romo argues that section 21.01 of the Texas Penal Code does not establish that any fine should be imposed against him. In response, the State argues Romo waived his constitutional complaint on appeal. The State further argues that the fine imposed against Romo does not violate his rights under the Eighth Amendment because it was not excessive.

Romo concedes that he failed to raise the issue of an excessive fine under the Eighth Amendment in the trial court, and thus, his constitutional complaint is waived. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Crim. App. 1996); *Curry v. State*, 910 S.W.2d 490, 496 n.2 (Tex. Crim. App. 1995); *Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd). However, an illegal sentence cannot be waived and may be challenged at any time. *O'Reilly v. State*, 501 S.W.3d 722, 729 (Tex. App.—Dallas 2016, no pet.) (citing *Ex parte Pena*, 71 S.W.3d 336, 339 (Tex. Crim. App. 2002)). "An illegal sentence is one that is not authorized by law." *Id*. at 728. Thus, we review Romo's sentence for an illegal fine.

Section 12.32 of the Texas Penal Code sets out general guidelines for punishment of first-degree felonies to include a possible fine, which may not exceed $10,000. TEX. PENAL CODE § 12.32(b). Continuous sexual abuse of a child is a first-degree felony. *Id*. § 21.02(h). Section 21.02(h) sets out its own elevated prison minimum for such offenders of "life" or "any term of not more than 99 years or less than 25 years." *Id*. § 21.02(h). But, section 21.02(h) does not abrogate the possibility of a fine up to $10,000. *See Barroquin-Tabares v. State*, No. 05-15-00794-CR, 2016 WL 3144160, at *4 (Tex. App.—Dallas May 31, 2016, no pet.) (mem. op., not designated for publication); *see also* TEX. GOV'T CODE § 311.026(a) ("If a general provision conflicts with a special or local provision, the provisions shall be construed, if possible, so that effect is given to

both."); *Haywood v. State*, 344 S.W.3d 454, 465 (Tex. App.—Dallas 2011, pet. ref'd) (laws pertaining to same subject should be construed in conjunction with each other and harmonized as a whole). Accordingly, the $10,000 fine in this case was not an illegal sentence. We thus overrule Romo's third issue.

## CONCLUSION

We affirm the judgment of the trial court with respect to Count I (continuous sexual abuse of a child younger than fourteen years) and Count II (indecency with a child). However, because we have determined that the video at issue in this case does not constitute child pornography as a matter of law, we hold the evidence is legally insufficient to support Romo's conviction on Count III. Accordingly, with respect to Count III, we reverse the judgment of the trial court and render a judgment of acquittal.

Liza A. Rodriguez, Justice

PUBLISH